J-A30004-17

2020 PA Super 72

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| CHARLES P. MCCULLOUGH | |
| Appellant | No. 233 WDA 2016 |

Appeal from the Judgment of Sentence Entered December 17, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No.: CC2009-10522

BEFORE:  SHOGAN, STABILE, JJ., and FORD ELLIOTT, P.J.E.

OPINION BY STABILE, J.:                    **FILED MARCH 25, 2020**

This case returns to us following remand for the Court of Common Pleas of Allegheny County ("trial court") to conduct an evidentiary hearing regarding the facts alleged in McCullough's November 5, 2015 recusal petition.  Upon careful review of the record, we now affirm Appellant Charles P. McCullough's ("McCullough") December 17, 2015 judgment of sentence relating to his bench convictions for five counts of theft by unlawful taking and five counts of misapplication of entrusted funds.[1]

The facts and procedural history underlying this appeal are uncontested. Sometime in early 2006, the now-deceased victim Shirley H. Jordan ("Jordan"), a nearly ninety-year-old widow without any children who lived in a senior living facility, engaged the legal services of McCullough.  Jordan, whose assets were valued at approximately fourteen million dollars, executed

_____

[1] 18 Pa.C.S.A. §§ 3921(a) and 4113(a), respectively.

a power of attorney in favor of McCullough, who acted as her agent and co-trustee of her trust. Subsequently, he was charged with twenty-four crimes in connection with his improper use of his status as power of attorney for Jordan to misappropriate her funds. Specifically, McCullough was charged with seven counts of theft by unlawful taking, two counts of theft by deception, one count of criminal conspiracy to commit theft, nine counts of misapplication of entrusted funds, two counts of false reports to law enforcement authorities, one count of unsworn falsification to authorities, one count of tampering with public records, and one count of failure to disclose financial interests.[2]

On December 29, 2014, McCullough filed a petition for writ of *habeas corpus*, seeking to dismiss with prejudice the charges filed against him. On April 7, 2015, Senior Judge Lester G. Nauhaus ("Judge Nauhaus") conducted a hearing on the petition, at which McCullough's trial counsel, Jon Pushinsky ("Attorney Pushinsky"), notified Judge Nauhaus that McCullough would "go non-jury." N.T. Hearing, 4/7/15, at 15. Following the hearing, Judge Nauhaus granted in part and denied in part the *habeas* petition. Specifically, Judge Nauhaus granted *habeas* relief only with respect to count 15, *i.e.*, a charge for theft by deception.

---

[2] 18 Pa.C.S.A. §§ 3921(a), 3922, 903(a)(1), 4113(a), 4906, 4904, 4911, and 65 Pa.C.S.A. § 1104, respectively.

The case proceeded to a bench trial before Judge Nauhaus that began with McCullough being colloquied on his decision to waive his right to a jury trial. The trial court summarized the evidence adduced at trial as follows:

Jordan was employed as a secretary by Fred Jordan at his successful real estate business from which he also managed his assets. With Jordan's assistance, he managed the financial affairs of his marriage. After Fred Jordan's first wife died, he and Jordan became romantically involved and married. Fred Jordan retained Reed, Smith which represented him in connection with not only his business but, also, his personal affairs. When he married Jordan, they had lawyers at Reed, Smith prepare mutual wills for each other where when one of the spouses died, the surviving spouse inherited all of the other's assets. At the death of the second spouse, all of the assets were to be left in proportion to a list of their charities. While Fred Jordan's will contained a specific charitable request to St. Clair Memorial Hospital, no such bequest was made in Jordan's will.

Fred Jordan died in 1994 and sometime in early 1995, Jordan called Reed, Smith and asked to speak to one of the partners in their estates and trust department. The individual that she asked to speak to was not there and she was then asked to call back in the hopes of contacting him on another date. When she did call back, that partner was still not there and Stephen P. Paschall, Esquire, was asked to handle this call. Jordan told him that she and her husband had been represented by Reed, Smith and they had prepared their wills. After meeting with her several times and discussing the contents with her over the phone, Paschall prepared a new will for her in light of the fact that her wealth had increased significantly. Under this will a foundation would come into existence after her death and a revocable trust was created to provide for certain interests and protection for her during her lifetime. Paschall prepared a will for her, disposing of her tangible assets, the appointment of an executor and also created a trust through a revocable declaration of trust in which she was the settler and trustee. Paschall continued to represent Jordan until 2005 when he received a letter from her directing him to transfer her files to McCullough.

During the time that Paschall represented Jordan, he would speak to her on almost a weekly basis and sometimes for more than an hour. In his dealings with her, he found that she was a very clever and astute woman and she was reluctant to give up control of her finances. During their telephone conversations, they would have discussions about charitable contributions and Jordan indicated that she had a particular desire to benefit animals and charities that aided the blind. She also indicated to him that she had no interest in donating to religious organizations.

During the latter years of his representation of Jordan, his work was primarily focused on collecting her dividend checks and ensuring that they were deposited in the bank, preparing checks for bills that she had and doing other financial driven assignments for her. Paschall testified that he had lengthy political discussions with Jordan and although she identified herself as a Goldwater Girl, she was very supportive of Bill and Hillary Clinton and her most frequent political comment was that she wanted to do something to strengthen the [D]emocratic party in Upper St. Clair, where she lived.

Demonstrating her sense of control, Jordan had two locks on the front door of her house which required two different keys to unlock them. She gave one key to an individual by the name of Dutch, who was doing her landscaping and she gave the other key to Paschall. Paschall received a telephone call sometime during 2004 from Dutch who indicated that there was mail piling up as were the newspaper on the front door and that when he attempted to gain entrance, he could not since he did not have the other key nor could he ascertain whether or not there was anybody in the residence. Paschall then went to Jordan's house in Upper St. Clair and he and Dutch then opened the front door only to find that she was lying on the floor in the living room and it appeared that she had been there for several days. Jordan responsively called his name but in light of her physical condition, an ambulance was called and she was taken to Presbyterian-University Hospital. When he visited her the day following her admission, he found her to be responsive and he was asked by her attending physician whether or not he had a power of attorney to authorize medical treatment for her and he responded that he did not. Paschall decided that he would file an emergency proceeding to have him named temporary guardian of her person. At a hearing before the Honorable Lee Mazur, Paschall agreed to be the temporary guard of her person but when asked if he wanted to be the guardian of her estate, he told Judge Mazur that Mazur did not know this woman and that if she survived this fall and found out that Paschall had anything to do with her money, she would kill him. Following her treatment at Presbyterian-University Hospital, she was discharged to Heritage at Shadyside, which is a rehabilitative facility where she stayed anywhere from fifteen to thirty days. At the time of her discharge from the hospital, Paschall noticed that she was responsive and lucid and requested a desire to return to her home rather than another medical facility.

Jordan owned approximately seven acres of undeveloped real estate directly across the street from St. Clair Country Club. Sometime in late 2004 or early 2005, Upper St. Clair Township desired to obtain an easement over a portion of this real estate and directed its solicitor to contact Jordan's lawyers in an attempt to resolve the issue short of litigation. Upper St. Clair Township attempted to negotiate with Jordan and her lawyers at Reed, Smith to amicably resolve the question of obtaining an easement. When they were unable to do so, they filed suit and McCullough was assigned to represent Upper St. Clair Township in connection

with this lawsuit. McCullough once mentioned to James Roddey that Jordan was so impressed in the manner in which he handled the case which he won for Upper St. Clair Township that she discharged her lawyers and hired him to represent her. McCullough then prepared a letter for Jordan to sign directing that Paschall furnish all of Jordan's file to McCullough.

In 2001, it came to the attention of Thomas L. Gray, relationship manager of the trust/wealth management group at Pittsburgh National Bank [("PNC")], that Jordan was making repeated deposits of significant amounts of money at their Upper St. Clair branch office. In light of the significant amounts of money that Jordan was depositing, Gray decided to meet with her and explain the benefits of the trust/wealth management department at [PNC] and explained that they could monitor her stocks and make sure that the dividend checks that she was receiving were timely and appropriately deposited. Jordan had stocks in more than ninety companies and was receiving dividend and interest checks on almost a daily basis.

In the Fall of 2005, Gray received a telephone call from Paschall who informed him that they were starting a guardianship proceeding for Jordan in light of the injuries that she sustained in a fall that she had in her home. In January of 2006, Gray received a telephone call from McCullough advising him that he was now representing Jordan and asked Gray to meet with him at Jordan's house. When they went to Jordan's house, McCullough presented Gray with a power of attorney that was signed by Jordan.

Gray met with members of his trust and wealth department and they were of the opinion that a trust should be prepared for Jordan in light of her age and her significant wealth. It was determined that there would be two trustees, one being [PNC] and the other being McCullough. Gray was advised by Jordan that she had hired McCullough because she did not want to go through a guardianship proceeding and stated that he had been successful as the solicitor for Upper St. Clair Township. Gray went to the Grand Residence where Jordan was staying and presented her with the trust document which he explained to her and which he believed that she understood and watched her sign that document. In the months that ensued the relationship between [PNC] and McCullough became strained due to the demands being made by McCullough as to how Jordan's finances were to be handled. At one point McCullough wanted [PNC] to divest itself from a substantial portion of Jordan's assets and place them in another banking institution, which [PNC] refused to do. In addition, McCullough wanted [PNC] to purchase a half million-dollar certificate of deposit from Northwest Bank, which it again refused to do. McCullough also wanted the trust to purchase a piece of real estate that was owned by one of McCullough's other clients. McCullough advised Gray that if they could not agree on his requests, then he would terminate the trust.

In March of 2006, Lana Boehm, was assigned to handle the day-to-day dealings on Jordan's account which consisted of the collection of the dividend checks and depositing them in the appropriate accounts for Jordan. Shortly after she began to work on Jordan's account, she received a communication from Gray who told her that McCullough told her that Jordan wanted a ten-thousand-dollar check to be drawn on her account made payable to Catholic Charities and delivered to that organization. That check was prepared and sent to Catholic Charities and Boehm became concerned about the issuance of that check when she received the acknowledgement letter from Catholic Charities which was signed by Patricia McCullough. She asked Gray if Patricia McCullough was related to McCullough and was informed that she was his wife. Boehm believed that this was a conflict of interest and then proceeded to pass this information along to other people in her group.

The information concerning how McCullough was handling the Jordan estate was eventually passed on to Frances E. Johnston, a senior vice president of PNC's wealth management group, who served as the western regional trust director. After meeting with a number of individuals who worked on the Jordan account, Johnston had numerous reservations about how McCullough was handling that account. She was concerned that McCullough had requested that his sister, Kathleen, serve as a companion for [] Jordan and that she was to be paid at an above-market rate. She was also concerned about the ten-thousand-dollar charitable contribution made to Catholic Charities at the direction of McCullough when his wife served as the executive director of that organization. She also had concerns by a request by McCullough to have PNC use five hundred thousand dollars of the trust assets to buy CDs at Northwest Bank. She saw an absolute conflict of interest in McCullough's suggestion that the trust buy certain real estate which was owned by another client of McCullough's. In addition to this conflict, this was not a sound investment strategy for an individual who was ninety years old. The last thing that she was concerned about was McCullough's request that his son be hired to cut Jordan's lawn. Johnston reviewed these concerns with Gray and Boehm and advised them to talk to McCullough as to what they saw as conflicts of interest with respect to the handling of Jordan's affairs.

All of the individuals who dealt with Jordan's estate were aware that McCullough had a power of attorney and they believed that the power of attorney was valid. The power of attorney had a medallion guarantee on it, which is extremely unusual. That guarantee was not part of the power of attorney, but rather, only insured that power of attorney was a true and correct copy of the original one that was signed. The power of attorney signed by Jordan in favor of McCullough provided as follows:

> The page that has the notice. "Know all persons by these presence which are intended to constitute a general durable Power of Attorney pursuant to the Pennsylvania Probate,

Estates and Fiduciaries Code of 1972, 20 Pa.C.S.A., Sections 5601-5608, *et seq.*, as amended, that I, Shirley H. Jordan, of The Grand Residence, Suite 207, McMurray Road, Upper St. Clair, Pennsylvania 15241 hereby revoke all prior Powers of Attorney signed by me, including the one made by me in favor of Lance Whiteman, and do make, constitute and appoint Charles P. McCullough, Esq., as my true and lawful agent, to act for me and in my name, to manage any and all of my personal business and financial affairs should I be incapacitated and not able to do the same myself and, in connection therewith, to perform all such acts as my agent deems necessary or proper, including specifically but not by way of limitation, full authority to do any or all of the enumerated acts set forth below."

This power of attorney defined her incapacity as follows:

"For the purpose of determining whether I am incapacitated as stated aforesaid, a written statement by my physician or a physician selected by my agent that I am incapacitated shall suffice."

The power of attorney that Jordan executed was a spring power of attorney since the document did not go into effect until it had been determined that Jordan was incapacitated. The finding that she was incapacitated required a written statement from her physician or a physician selected by her agent that stated that she was incapacitated. While no such written statement was ever made, all of the people at PNC believed that McCullough's power of attorney was valid premised upon McCullough's statements and actions and the information that a guardianship proceeding had been instituted on behalf of Jordan, which proceeding was instituted prior to the signing of the power of attorney by Jordan.

Catholic Charities began its fundraising efforts for the year in January of 2006 with a projected goal of six hundred thousand dollars. In March of 2006, Patricia McCullough was named as the executive director of Catholic Charities. The Catholic Charities fundraising efforts were to continue through May when their annual dinner was held and at which time they would announce whether or not they had met their objective. Approximately a week before the dinner which was held at the end of May, Patricia McCullough told John D. Goetz, Esquire, who was the vice president of the board of Catholic Charities that they were short of their goal and it was unlikely that they would meet their goal. The day of the dinner she then advised him that there had been a last minute donation which allowed them to exceed their target and as the executive director, she told this to all of the people in attendance at that dinner that a last minute donation enabled them to meet their projected target. Goetz read an article in the Post-Gazette on April 13, 2007, which indicated that the money given to Catholic Charities was given against Jordan's will. They held an emergency board meeting at which point Patricia McCullough said that her husband was the trustee of Jordan's trust

- 7 -

and that Jordan voluntarily gave the money. In discussing this particular contribution with other board members, they believed that they should not take this since Jordan in the article maintained that she did not want to give the money to Catholic Charities and they also believed that it appeared to be a conflict of interest. A vote was taken and it was agreed that the money would be returned to the trust, which was done.

During the remainder of 2006, the conflicts between McCullough and PNC as the trustees of Jordan's trust, continued to increase to the point where McCullough threatened to dissolve the trust if PNC did not accede to his wishes. When PNC refused to do so, McCullough sent PNC a letter advising it that the trust had been dissolved and directed that it provide its first and final account.

In June of 2006, McCullough left Tucker Arensberg to become a non-equity partner at Eckert Seamans. When McCullough left Tucker Arensberg, he took all of his files with him, including Jordan's. McCullough met with Ray Vogliano and Jennifer Rawson, who specialized in estate practice and taxation, concerning this evolving estate plan for Jordan. McCullough told Ray Vogliano that despite the fact that her will directed that a charitable foundation would be created upon her death that Jordan, in fact, wanted one created while she was alive. Jordan and Vogliano discussed the significant tax benefits that would accrue to Jordan by the creation of this charitable foundation prior to her death and a decision was made to create the foundation. Rawson prepared the articles of incorporation for the Shirley Jordan Foundation although she normally would indicate that there would be three directors, McCullough advised her that he wanted to have eleven directors and provided her with the names of those individuals which included James Roddey, Vincent Gastgeb, Jan Rea and Susan Coldwell, Cheryl Allen and Doris Carson Williams among others. All of these individuals were heavily involved in Republican politics and none of them had ever met or heard of Jordan. It was McCullough's idea to meet six times per year and to pay each director the sum of one thousand dollars for attending the meeting.

When McCullough advised Roddey that he had a client who was interested in forming a charitable foundation, Roddey suggested that it be handled through the Pittsburgh Foundation since it assembled numerous private foundations and controlled a significant amount of money. McCullough told him that Jordan wanted him to establish the foundation and wanted him to handle its affairs. Roddey told McCullough that he thought that the eleven-person board of directors was unwieldy, especially in light of the fact that they were managing a relatively insignificant amount of money for a charitable foundation. In addition, he thought that there were too many meetings and they were being paid too much money for their attendance. When Roddey received the first check for one thousand dollars, he returned it since he did not believe that they should be receiving that much money.

In December of 2006, McCullough told Rawson to change the number of directors to three and that the remaining individuals could serve on the advisory board. The three directors were to be McCullough, Jordan and John Zadar, who was in the trust department of Northwest bank.

2007 was a municipal election year when people ran for the offices for county executive, county council, the court of common pleas and the appellate courts of the Commonwealth of Pennsylvania. Cheryl Allen, who was a Judge on the Court of Common Pleas of Allegheny County declared that she was a Republican candidate for the Superior Court and formed a finance committee to help her raise money for that campaign. James M. Norris, an attorney at Eckert Seamans, sponsored an event to be held in their offices and although Norris and McCullough were attorneys at Eckert Seamans, they had never met before the Cheryl Allen fundraiser. It was the one and only time that Norris had ever met or spoke to McCullough. At that event, McCullough went up to Norris, handed him an envelope and said this was for Judge Allen. Norris looked into the envelope and saw that there was check drawn on the account of Shirley Jordan and payable to Cheryl Allen's campaign committee in the amount of ten thousand dollars. In addition to having Shirley Jordan's name on the check, McCullough's name also appeared on that check.

During the 2007 election year, the office of county executive and seats for county council members were also subject to election. County council is composed of fifteen individuals, thirteen of whom represented a specific legislative district and two represented the county at large. In 1999, the county executive/county council form of government replaced the three commissioners and the first county executive elected was James Roddey who began his term in 2000. David Fawcett, Esquire, was elected to one of the two county-wide council seats and he was subsequently reelected in 2003. Fawcett made the determination that he did not want to run for a third term, thereby opening that seat up for election.

When Roddey was elected county executive, McCullough was recommended to him to become the county solicitor because of his extensive experience in municipal law. Roddey appointed McCullough as the county solicitor and over the next four years, their relationship grew to the point that Roddey believed that McCullough viewed him as a mentor. McCullough told Roddey that he wanted to be a federal judge and this was his ultimate goal. When David Fawcett declared that he did not intend to seek reelection, McCullough went to Roddey and told him that he was going to run for that county council seat. Roddey advised him that it was not a good idea to run and that he should continue to handle municipal work if he intended to pursue his goal of being a federal judge. McCullough told Roddey that that was good advice and that he would not run.

- 9 -

Kevin Acklin, who was a city resident and registered [R]epublican came to Roddey after he had learned that McCullough was not going to run for the countywide county council seat. Acklin was active in his community and was a good candidate and was from the city and it would be a good idea to get a [R]epublican on county council who lived in the city. Acklin sought Roddey's endorsement and Roddey told him that he would endorse him and encouraged him to meet with other [R]epublican leaders. After Roddey had committed to endorse Acklin, McCullough came back to Roddey and told him he had reconsidered Roddey's advice and decided that he would run for the county council seat. Roddey informed him that he had already committed to Acklin and he would not go back on that commitment and that others in the party had also endorsed Acklin. McCullough was not pleased to find out that Acklin had secured these endorsements and the fact that Roddey would not go back on his commitment to Acklin.

After receiving the endorsement of James Roddey, Acklin sought out other members of the [R]epublican party and received commitments from Vincent Gastgeb, Jan Rea and Susan Coldwell, to endorse him for the county council seat. The [R]epublican party holds an annual dinner shortly before its endorsement for candidates called the Lincoln Day Dinner. Acklin attended that dinner and saw that McCullough was also there. When he was on his way home he received a telephone call from his friend, Michael Devaney, who told him that McCullough had delivered very big checks to [R]epublican candidates for county council.

The next day Acklin had a conversation with Gastgeb who told him that he was very sorry that he had to withdraw his endorsement because McCullough had made him his finance director. Gastgeb also told Acklin that McCullough had given him a check for ten thousand dollars but the money was from a client. The check, however, bore not only the client's name, but also, McCullough's name. Other checks went to Jan Rea and Susan Coldwell. All of the checks had McCullough's name on them even though they were drawn on Jordan's account.

Michael Devanney who is a political consultant with Cold Spark Media was not working with Acklin as a client but, rather, as a friend since they had known each other since high school. Devanney helped him create his web page, helped him draft his campaign literature and made suggestions as to how his campaign should be run. When he heard that McCullough had decided to run, he had a telephone conversation with McCullough where they agreed to meet and the meeting took place at the Eat 'N Park on Banksville Road in the City of Pittsburgh. That meeting lasted anywhere from an hour and one half to two hours and McCullough told Devanney that he was in the race to stay, that he had a wealthy client who was going to support his campaign and his interests. McCullough also told him that he was going to make campaign contributions to Rea, Coldwell and Gastgeb, even though each of these individuals was unopposed in their primary election campaigns. Devanney attended the Lincoln Day Dinner

in late February and witnessed McCullough going around the room glad-handing and apparently passing out the checks that he told him that he was going to distribute.

John Zadar, who was in the trust department at Northwest Bank, first met McCullough in the Fall of 2006 and McCullough told Zadar that he had a client whose funds had to be handled and not managed and asked that Zadar become a trustee in Jordan's trust, which he agreed to do. Jordan's funds were not transferred to Northwest until the early part of 2007, after the first and final account of [PNC] had been approved.

In February of 2007, John Zadar and Lisa Carey of Northwest Bank received an email from McCullough requesting four political checks to be drawn on Jordan's account made payable to Jan Rea, Susan Coldwell, Vincent Gastgeb and Cheryl Allen. McCullough wanted the checks immediately and wanted them hand-delivered to his office. Lisa Carey said that there was not enough money in the checking account to cover these checks so they had to draw down on the trust account to provide for the money to cover these checks. The checks were then personally delivered to McCullough who gave them to his secretary, Susan Brunner, with a hand-written note which she was instructed to write on the checks, Shirley Jordan in care of Charles McCullough. She did as instructed and gave those checks back to McCullough, which checks were subsequently delivered to Cheryl Allen at a fundraiser held in her honor at Eckert Seamans and to the county council candidates at the Lincoln Day Dinner.

Erica Clinton Wight was a media research consultant for Kevin Aklin's campaign in 2007. When information arose that Jordan had made four political contributions to various [R]epublican candidates in the amount of ten thousand dollars apiece, she decided to investigate why Jordan made these contributions. Wight had never heard of Jordan being involved in any type of politics ever before and as a media consultant, it was part of her job to know the names of likely contributors and people prominent in political spheres. Wight found out that Jordan was in the Grand Residence and made a call to the main number for that facility. She asked to speak to Jordan and was connected to Jordan's room when a caretaker answered the phone. She asked to speak to Jordan and Jordan was then put on the telephone. She asked if, in fact, she was speaking to Shirley Jordan and Jordan said she was, and she introduced herself as working for the [R]epublican party and she wanted to discuss with her the political contributions that she made of ten thousand dollars to three different candidates. When Jordan heard this she seemed to become agitated, her voice got louder and became concerned when Jordan told her she would never make donations to politics and she writes her own checks.

In the Spring of 2007, Dennis Roddy, was working for the Post-Gazette and was assigned by his editor to cover the appellate judicial races since there was one candidate from Allegheny

County who was seeking a spot on the Superior Court, that being Cheryl Allen. Roddy reviewed her financial disclosure form filed with the Department of State and discovered that she had listed total assets in the amount of thirteen thousand dollars but ten thousand dollars was from a single donation from Jordan. While he was at his office, he received an anonymous envelope which contained an account of the ten thousand dollar checks being given to county council candidates and a rhetorical question as to whether or not that the donor actually knew that this was happening. While he had received information indicating that county council candidates had received similar ten thousand dollar checks, their deadline for filing their financial disclosure forms had not passed and there was nothing in the public record as to those donations. Roddy decided to check Jordan out and found out that she lived in Upper St. Clair, although at the time she was living at the Grand Residence. He checked for prior political contributions and found none. In speaking with his political contacts, nobody had ever heard of her. Roddy found out that she was over eighty years old and inactive on the voter registration list since she had not voted in more than seven years.

Roddy decided to visit her and went to the Grand Residence on April 10, 2007 and was there for approximately one hour. Roddy went to the registration desk and told the receptionist that he was there to visit Jordan and she told him what room Jordan was in. Roddy went to that room and saw Jordan and Jan Skowvron. He told them who he was and produced his reporter's identification card from the Pittsburgh Post-Gazette. Jordan told him that she would like to speak with him and he told her that he was covering a political race and noticed that she was a substantial contributor to one candidate and possibly more. Jordan responded, that's my lawyer, he wants to be important in politics. Jordan told him that she had learned of a donation from a telephone call and she said that her attorney had given the money. Roddy advised her that it was ten thousand dollars per candidate and Jordan was startled and gasped, "ten thousand, I can't", she would never make such a donation to a political campaign. Her tone was surprised and then angry. She was agitated, taken aback and quite surprised by this and was angry at McCullough.

She told Roddy that McCullough had been taking too much control over her affairs and said that he was a cheap politician. She was angry, cross and clearly surprised, but coherent. The next day Roddy received a telephone call from McCullough who told him that Jordan was a Goldwater Girl and she wanted to resume her political activities again and asked him if there were candidates to support and he suggested three or four. He told Roddy that she was particularly enthusiastic about Allen because she had become active in her foundation. When Roddy asked Jordan whether or not she would support Allen, she said no, she had her reasons but would not disclose them.

Janet Skowvron who is a licensed practical nurse was in Jordan's room when Roddy arrived. She verified that Roddy produced his

Post-Gazette identification and he was there to ask her certain questions about political contributions that she had made. She knew Jordan to be a very private person and when she found out that political contributions were being made from her funds, she told Roddy that McCullough was a crook. At the time that Roddy was there, Jordan was lucid and comprehended all of the information that was being given to her.

On April 13, 2007, the Post-Gazette published Roddy's article with respect to the political contribution allegedly made by Jordan to Cheryl Allen. As a follow-up article, Roddy also reported that ten thousand dollar political contributions were made to Rea, Gastgeb and Coldwell. After reading these articles, Rea, Gastgeb and Coldwell all decided to return the money to Jordan. Debbie Lesko, the treasurer for Cheryl Allen's campaign also returned the money after she read Roddy's articles. While Patricia McCullough did not want anyone to know who the anonymous donor was who contributed ten thousand dollars to Catholic Charities, the board of Catholic Charities eventually determined that that anonymous donation came from McCullough's client Jordan, and they voted to return the money, which they did.

Trial Court Opinion, 5/1/17 at 11-29 (record citations and footnote omitted).

At the conclusion of trial, Judge Nauhaus found McCullough guilty of five counts of theft by unlawful taking and five counts of misapplication of entrusted property. Judge Nauhaus scheduled sentencing for November 9, 2015.

On October 23, 2015, Attorney Pushinsky filed a motion to withdraw from the case and to continue the November 9, 2015 sentencing to allow McCullough time to secure substitute counsel. On November 3, 2015, a hearing on Attorney Pushinsky's motion was held before Judge Nauhaus. Attorney Pushinsky notified Judge Nauhaus that McCullough had arranged for substitute representation by Megan Will, Esquire ("Attorney Will"), who informed Judge Nauhaus that she needed thirty days to prepare for sentencing, as McCullough had retained her within the past week. Judge

Nauhaus granted Attorney Pushinsky's motion to withdraw and denied the continuance, thereby preserving the scheduled sentencing date of November 9, 2015.

On November 5, 2015, McCullough filed a "Petition for Judicial Recusal," alleging that Judge Nauhaus engaged in *ex parte* communications with Attorney Pushinsky and other court officers **prior** to rendering the guilty verdicts.[3] McCullough alleged that Attorney Pushinsky informed him of the alleged *ex parte* communications. McCullough specifically alleged that, on December 29, 2014, after Attorney Pushinsky petitioned the trial court for the issuance of a writ of *habeas corpus*, Attorney Pushinsky called McCullough to inform him that Judge Nauhaus "just called me and yelled at me for filing the *Habeas* Petition." Petition for Judicial Recusal, 11/5/15 at ¶¶ 4-5. McCullough alleged that, in response, he stated to Attorney Pushinsky that Attorney Pushinsky "needed to move to have [] Judge Nauhaus recused from [McCullough's] case." **Id.** at ¶ 6. Attorney Pushinsky, however, failed to seek

---

[3] Our Supreme Court has defined the term *ex parte* as:

> On one side only; by or for one party; done for, in behalf of, or on the application of, one party only. A judicial proceeding, order, injunction, etc., is said to be *ex parte* when it is taken or granted at the instance and for the benefit of one party only, and without notice to, or contestation by any person adversely interested.

*Commonwealth v. Carpenter*, 725 A.d 154, 168-69 (Pa. 1999) (citation omitted). With exceptions not applicable here, both the Code of Judicial Conduct and Rules of Professional Responsibility prohibit *ex parte* communications. **See** Code of Judicial Conduct Rule 2.9, and Rule of Professional Conduct 3.5(b).

recusal. *Id.* McCullough alleged that a second *ex parte* communication occurred between Judge Nauhaus and Attorney Pushinsky. Prior to trial, Attorney Pushinsky informed McCullough that Judge Nauhaus told Attorney Pushinsky through a mutual friend "to go non-jury." *Id.* at ¶ 10. According to McCullough, Attorney Pushinsky informed him that "Judge Nauhaus preferred jury trials only in capital cases" and that McCullough "'would not be sandbagged' if he elected to have a nonjury trial." *Id.* McCullough claimed that Attorney Pushinsky told him "not to repeat this *ex parte* communication to anyone." *Id.* at ¶ 11. McCullough claimed that prior to learning of Judge Nauhaus' *ex parte* communication with Attorney Pushinsky, McCullough did not wish to waive his right to a jury trial. *Id.* at ¶ 12. McCullough claimed that he waived his right to a jury trial only because he "feared repercussions" if he did not follow Judge Nauhaus' directive to go non-jury. *Id.* McCullough alleged a third *ex parte* communication, which purportedly occurred during the pendency of his trial and prior to McCullough's presentation of his defense, *i.e.*, six to seven weeks before Judge Nauhaus rendered the trial court's verdict. *Id.* at ¶ 14. McCullough alleged that "an acquaintance of [McCullough], who has been involved in Allegheny County politics for some time and who is familiar with [the] courthouse staff, told [McCullough] that he had had a conversation with an individual who works in the courthouse and who knew [Judge Nauhaus'] secretary." *Id.* Specifically, McCullough alleged that the secretary "advised the individual that [Judge Nauhaus] was of the mind that the case was not proven, but after a conversation between [Judge

Nauhaus] and his secretary, they agreed that a conviction of the five counts dealing with the checks had to occur." *Id.* McCullough further claimed that Judge Nauhaus convicted him "of the charges associated with five particular checks," as foretold by the *ex parte* communication. *Id.* at ¶ 15.

Given the allegations contained in his recusal petition, McCullough asserted a violation of his due process rights under the United States and Pennsylvania constitutions insofar as he was not "afforded a right to a [trial] before a neutral factfinder or a right to a jury trial."[4] *Id.* at ¶ 34. Thus, recognizing a conflict in testimony, McCullough requested "a hearing by a neutral factfinder." *Id.* at ¶¶ 32-33. McCullough also requested that "Judge Nauhaus recuse himself of his own volition, or, alternatively, grant a hearing on [the recusal petition] so that the matters contained herein may be more fully explored." *Id.*

On November 9, 2015, on the day of sentencing, Judge Nauhaus addressed McCullough's petition for recusal on the record. In so doing, he objected to the characterization of the alleged communications as *ex parte* communications, believed the recusal matter to be a post-sentence issue, and granted McCullough's request to delay sentencing by thirty days. Sentencing was rescheduled for December 17, 2015. McCullough was then colloquied on his decision to delay sentencing beyond the ninety-day period. *Id.* at 12-14; *see* Pa.R.Crim.P. 704(A) ("[S]entence in a court shall ordinarily be imposed

_____

[4] McCullough's petition makes clear the relief he seeks is not limited to resentencing, but also may include a new trial.

- 16 -

within 90 days of conviction or the entry of a plea of guilty or *nolo contendere*.").

On November 12, 2015, the Commonwealth filed a "Request for an Evidentiary Hearing and Appointment of Judge to Preside over [McCullough's] Petition for Judicial Recusal." The Commonwealth, *inter alia*, averred that McCullough's recusal petition alleged "material *ex parte* contacts between This Honorable Court[, *i.e.*, Judge Nauhaus], [Attorney Pushinsky], and unnamed third parties." Request for Evidentiary Hearing, 11/12/15, at ¶ 2. As a result, the Commonwealth requested that Judge Nauhaus grant its request for an evidentiary hearing and recuse himself from presiding over the hearing. On November 16, 2015, McCullough filed a response to the Commonwealth's request for an evidentiary hearing. In the two-paragraph answer, McCullough stated that he "joins in the Commonwealth's request to have another judge preside over [McCullough's] hearing for judicial recusal." Response to Evidentiary Hearing, 11/16/15, at ¶ 1. On the same day, President Judge Jeffrey A. Manning ("PJ Manning") issued an order scheduling an evidentiary hearing on McCullough's recusal petition for November 19, 2015.[5]

PJ Manning presided over the evidentiary hearing, at which Martin L. Schmotzer and Attorney Pushinsky testified. At the start of the hearing, PJ Manning explained that he was presiding over the hearing because Judge

---

[5] Given PJ Manning's involvement, it appears that Judge Nauhaus granted the Commonwealth's request for an evidentiary hearing and recused himself from presiding over the hearing.

- 17 -

Nauhaus referred the recusal motion to him and to Judge David Cashman, who was the administrative judge of the criminal division. N.T. Hearing, 11/19/15, at 4-5.

Mr. Schmotzer was called to the stand to testify about the third *ex parte* communication. He testified that he was a friend of McCullough and that he had conversations with McCullough about McCullough's case. **Id.** at 10. Specifically, Mr. Schmotzer testified that he relayed to McCullough a conversation that "was told to [him] thirdhand." **Id.** at 11. Mr. Schmotzer explained, "[s]omeone called me up on the phone and asked to meet with me about a conversation they had had, but it wasn't with [Judge Nauhaus]. It was with, you know, that person and the secretary, not the Judge." **Id.** at 12. The Commonwealth objected, based on hearsay, to the content of the conversation. The trial court sustained the objection. Nonetheless, when pressed by Attorney Will to name the source, Mr. Schmotzer refused to reveal the source's identity, without asserting any privilege. **Id.** at 15.

McCullough next called to the stand Judge Nauhaus, who along with his counsel was present in the courtroom. **Id.** at 16. Judge Nauhaus' attorney objected, arguing that Judge Nauhaus was incompetent to testify under Pa.R.E. 605 (prohibiting witness testimony of presiding judge). PJ Manning agreed, and thus sustained the objection made by Judge Nauhaus' attorney. **Id.** at 23. McCullough thereafter sought to elicit the testimony of Attorney Pushinsky, whom McCullough, on the record, granted a limited waiver of the attorney-client privilege regarding two *ex parte* communications Attorney

- 18 -

Pushinsky had with Judge Nauhaus. *Id.* at 24-26. Attorney Pushinsky, however, through his counsel, insisted on a complete waiver of attorney-client privilege before answering any questions. Over McCullough's objections, the trial court agreed with Attorney Pushinsky and permitted him to remain silent in the absence of a full waiver of privilege. Following McCullough's presentation of witness testimony, PJ Manning concluded that McCullough failed to produce any evidence to call into question Judge Nauhaus' impartiality. *Id.* at 45. PJ Manning reasoned that the allegations in the recusal petition, absent any evidence, were "scurrilous." *Id.* at 46. PJ Manning thus denied and "vacated and discontinued" McCullough's recusal petition. *Id.* at 47. Even though PJ Manning denied the recusal petition, Judge Nauhaus also issued an order denying McCullough's recusal petition on December 10, 2015.

Sentencing occurred, as scheduled, on December 17, 2015. Instead of Judge Nauhaus, Judge David R. Cashman ("Judge Cashman") presided over the sentencing hearing. Judge Cashman explained that "Judge Nauhaus did not recuse himself but, rather, asked that the case be reassigned for the purpose of sentencing because of a health issue that he had, and President Judge Manning then assigned the case to me for the purpose of sentencing." N.T. Sentencing, 12/17/15, at 38. On the five counts of theft by unlawful taking, Judge Cashman sentenced McCullough to six to twelve months' incarceration on each count to run consecutively. *Id.* at 39-40. Judge Cashman did not impose any additional penalty for the five counts of

- 19 -

misapplication of entrusted property. *Id.* at 40. McCullough's aggregate sentence was 30 to 60 months' imprisonment.

McCullough timely filed post-sentence motions, asserting, *inter alia*, that he was entitled to a new trial because of "the improper handling and disposition of [his] motion to recuse [Judge Nauhaus]." Amended Post-Sentence Motion, 12/30/15, at 12. Following a hearing, Judge Cashman denied McCullough's post-sentence motions on February 5, 2016. Judge Cashman, however, granted McCullough bond pending appeal on the condition that McCullough surrender his passport and not leave the jurisdiction without the court's prior approval. McCullough timely appealed to this Court. McCullough and the trial court complied with Pa.R.A.P. 1925.

On appeal, McCullough presented the following issues, reproduced here verbatim:

[I.] Whether the evidence was insufficient as a matter of law on the counts charging theft by unlawful taking, 18 PACS § 3921, when the Commonwealth failed to prove beyond a reasonable doubt that [McCullough] knowingly took the property of the alleged victim unlawfully, since [McCullough] was a co-trustee of the alleged victim's estate, her attorney, and a person who held (and believed he held) a valid power of attorney authorizing him to request that co-trustees issue checks from her estate?

[II.] Whether the evidence was insufficient as a matter of law on the counts charging misapplication of entrusted funds, 18 PACS § 4113, when the Commonwealth failed to prove beyond a reasonable doubt that [McCullough] requested that donations be made from the estate of an alleged victim for whom he was a fiduciary knowing that the donations were unlawful and involved a substantial risk of loss and detriment to the owner?

[III.] Whether serious procedural errors occurred in the litigation of [McCullough's] motion for recusal which alleged that three *ex*

- 20 -

*parte* communications by [Judge Nauhaus] substantially prejudiced him when,

    a) [Judge Nauhaus] refused to affirm or deny whether the *ex parte* communications actually took place;

    b) the judge presiding over the hearing on the [recusal] motion:

        i. improperly excused [Judge Nauhaus] from testifying about the communications by erroneously interpreting Rule 605;

        ii. improperly excused [Attorney Pushinsky] from testifying about the communications by ruling that [McCullough] had to waive the entirety of his attorney/client privilege as a condition for counsel's testimony on the discreet matters at issue;

        iii. improperly excused [Mr. Schmotzer] who would have identified a key source of information on an *ex parte* communication by wrongfully declaring hearsay; and

    c) the [trial court] failed to appoint an out of county judge to hear the motion, in each instance and collectively denying [McCullough] the opportunity to develop his claim in violation of his rights to due process of law under the constitutions of the United States and the Commonwealth?

McCullough's Brief at 4-5 (unnecessary capitalizations omitted).[6]

We first addressed and examined in detail McCullough's third issue. ***See***

***Commonwealth v. McCullough***, 201 A.3d 221, 238-45 (Pa. Super. 2018).

Briefly, we concluded that the trial court abused its discretion in (1) excusing

Judge Nauhaus and Attorney Pushinsky from testifying at the November 19,

---

[6] At that juncture, based upon our disposition of the initial appeal, we declined to address McCullough's first two issues, implicating the sufficiency of the evidence. Those issues are now properly before us.

2015 evidentiary hearing, and (2) allowing Mr. Schmotzer to withhold the identity of the courthouse employee. Consequently, we remanded this case to the trial court, on December 19, 2018, with instruction to conduct a new evidentiary hearing on the recusal petition.

On April 5, 2019, McCullough issued a subpoena *duces tecum* to the Judicial Conduct Board ("JCB"), seeking "[a]ny and all records regarding or memorializing interviews of individuals generated in connection with the investigation by the [JCB] of a complaint against Senior Judge [Nauhaus] concerning his conduct while presiding over [this case] in the Court of Common Pleas of Allegheny County." Subpoena, 4/5/19 at 3 (unnumbered). In specific, McCullough sought "all witness statements, reports of interviews and/or other investigative reports reflecting statements obtained by Investigator Doug Miller and/or any other investigator in connection with this matter, including, but not limited to, interviews of Judge Nauhaus, [A]ttorney [] Pushinsky, [Mr.] Schmotzer, and other persons." ***Id.*** McCullough also specifically stated that the subpoena did not contain a request for production of any attorney work product, "any internal [JCB] documents or minutes reflecting the deliberative process of the [JCB] undertook in connection with this matter." ***Id.***

On April 22, 2019, the JCB filed a "Motion to Quash Subpoena and for a Protective Order." The JCB argued that Article 5, Section 18(a)(8) of the Pennsylvania Constitution "mandates that the records and information that [McCullough] seeks—if they exist—are not public, and the Board is

constitutionally required to maintain strict confidentiality." Motion to Quash, 4/22/19 at ¶ 5. The JCB further argued that, even if it possessed the requested materials, McCullough could obtain the same by cross-examining Judge Nauhaus, Attorney Pushinsky and Mr. Schmotzer at an evidentiary hearing ordered by this Court on remand. *Id.* at ¶ 7. Accordingly, the JCB requested that the trial court quash McCullough's subpoena and protect "it from further subpoena in this case without leave of court." *Id.* at 3 (unpaginated).

On May 1, 2019, Judge Cashman conducted an evidentiary hearing at the start of which the JCB argued its motion to quash the subpoena. Counsel for the JCB argued that under the Pennsylvania Constitution, complaints initiated by the JCB are not public information. N.T. Hearing, 5/1/19 at 6. The JCB noted that McCullough's right to confront a witness in a criminal case was not implicated because "these weren't witnesses that were called by the Commonwealth or not witnesses that go to directly to a defendant's guilt or innocence. They go towards whether or not [Judge Nauhaus] should have recused himself." *Id.* (sic). The JCB further noted that "[w]e're not dealing with the case in chief against [McCullough] but a recusal hearing." *Id.* at 7-8. The JCB observed that McCullough could prove his recusal petition by eliciting the testimony of Judge Nauhaus, Attorney Pushinsky and Mr. Schmotzer, among others. *Id.* at 9. Ultimately, the JCB declined to confirm or deny whether it ever had investigated a complaint filed against Judge Nauhaus. *Id.* at 8.

- 23 -

In response, McCullough's counsel noted that McCullough "was interviewed by the JCB." *Id.* at 9. McCullough's counsel further noted that he sought only witness statements from the JCB because they might be *Brady* materials or be exculpatory in nature.[7] *Id.* at 18. "We have not sought access to [the JCB's] work file. We're not trying to get th[eir] deliberative process. We're not even asking for their outcomes, Judge. All we have sought was witness statements that are in the possession of the [JCB]. We believe they're in their possession." *Id.* at 19. McCullough's counsel argued that based on the JCB's and McCullough's competing constitutional rights—one favoring confidentiality and the other guaranteed a right to confront—"there's a balancing test the [c]ourt is required to conduct. And a criminal defendant's right to access statements should take precedence." *Id.* The Commonwealth declined to take a position on the subpoena issue. *Id.* at 21. Following the hearing, the trial court granted the JCB's motion to quash and the protective order.[8]

Thereafter, the Commonwealth, represented by Attorney Michael W. Streily, characterized McCullough's claims relating to the recusal issue as nothing more than "smoke and mirrors." *Id.* at 22. The Commonwealth remarked:

---

[7] McCullough's counsel premised his argument on the Sixth Amendment to the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution.

[8] The docket reveals that the trial court filed the order granting the JCB's motion on May 9, 2019.

> However, the only way that we're going to prove that this is smoke and mirrors is by having a full hearing today. Because there are pending charges against [McCullough], as Your Honor knows, at CP-02-CR-000081-2016. They involve perjury, false swearing, unsworn falsification. [McCullough] would have a Fifth Amendment right.
>
> Your Honor, we have to have a full hearing. We want [McCullough] to take the stand. Your Honor I have discussed this with his attorney, [Adam B.] Cogan. I have discussed this with his attorney David Pollock, who represents him on the 2016 charges.
>
> Your Honor, it would be the motion of the Commonwealth, and this is subject to [McCullough] taking the stand and subjecting himself to cross-examination. But Your Honor, we would make a motion to *nolle pros* those charges at 2016, so that he has no fear of self-incrimination and he can take the stand and be cross-examined on these alleged *ex parte* communications.

*Id.* at 22-23. Thus, under Rule 585 of the Pennsylvania Rules of Criminal Procedure, the Commonwealth agreed to *nolle pros* with prejudice the 2016 charges in exchange for McCullough taking the stand. *Id.* at 23. The trial court, however, observed that the Commonwealth's offer for *nolle pros* was "premature" because McCullough had waived the recusal issue by failing to raise it at the earliest possible moment. *Id.* at 24-26. McCullough's counsel did not object to the trial court's rejection of the Commonwealth's *nolle pros* offer. *Id.* at 27. Rather, McCullough's counsel agreed with the trial court and proceeded to call the first defense witness, Judge Nauhaus. *Id.* (responding by using the term "exactly" after the trial court called the Commonwealth's motion "premature").

Judge Nauhaus testified that he presided over the instant case, which involved, among other things, theft charges against McCullough. *Id.* at 29. Judge Nauhaus was asked about the first instance of *ex parte* communication

with Attorney Pushinsky in connection with McCullough's filing of a *habeas* petition. *Id.* at 30-31. Judge Nauhaus testified that he was disturbed about the *habeas* filing and that he had a telephone conversation with Attorney Pushinsky about it. *Id.* at 31. Judge Nauhaus acknowledged that he called only Attorney Pushinsky and that the Commonwealth and McCullough were not on the line. *Id.* at 32-33. Describing the contents of the telephone call, Judge Nauhaus testified:

> What I made known to [Attorney] Pushinsky was the fact that it was the second *habeas* motion that had been filed in this case. This case had been handled by another Judge and it went to the Superior Court. It came back down. The other judge had ruled on the original *habeas* motion. I called [Attorney] Pushinsky to tell him it was the second motion. And to tell him that I would hear it. And to tell him that this case had dragged on far too long and to tell him when the hearing was going to be.

*Id.* at 32. Judge Nauhaus denied discussing anything else on that particular call. *Id.* Judge Nauhaus testified that he did not consider his telephone call with Attorney Pushinsky, which lasted five minutes, to constitute *ex parte* communication. *Id.* at 33.

McCullough's counsel then asked Judge Nauhaus whether he was ever interviewed by or provided a statement to the JCB in connection with this case. *Id.* at 34. The trial court, however, instructed Judge Nauhaus not to answer the question, noting that it "had nothing to do with" the evidentiary hearing and that it was irrelevant. *Id.* McCullough's counsel did not object to the trial court's instruction. Instead, counsel asked Judge Nauhaus a follow-up question relating to a possible investigation by the JCB pertainnig to McCullough's case. The trial court again instructed Judge Nauhaus that he did

- 26 -

not "have to answer that either." *Id.* McCullough's counsel once again did not object and continued his examination of Judge Nauhaus. Judge Nauhaus then testified that he did not recall advising the Commonwealth or McCullough of his telephone call with Attorney Pushinsky relating to the *habeas* motion. *Id.* at 34-35.

Next, Judge Nauhaus denied that there was a second *ex parte* telephone call with Attorney Pushinsky.[9] *Id.* at 35. When asked whether he recalled Attorney Pushinsky calling his chambers to set up a status conference, Judge Nauhaus answered in the negative. *Id.* at 35, 37. McCullough's counsel thereafter questioned Judge Nauhaus about the allegation that he communicated to Attorney Pushinsky through a mutual friend to go non-jury. *Id.* at 37. Judge Nauhaus acknowledged that Attorney Pushinsky and he had

_____

[9] As the parties concede, this second *ex parte* telephone call between Judge Nauhaus and Attorney Pushinsky was never raised or challenged in the recusal petition or at any point during the initial phase of this appeal. *See* McCullough's Supplemental Brief at 14, n.4; Commonwealth's Supplemental Brief at 22, n.5. McCullough also does not establish how or when he discovered this alleged second *ex parte* telephone call. Additionally, our December 19, 2018 remand order explicitly directed the trial court to conduct a new evidentiary hearing on the **recusal petition**. Thus, because McCullough did not allege the second *ex parte* communication in the recusal petition, we agree with the Commonwealth's assertion that he abandoned his right to seek recusal on that basis. Commonwealth's Supplemental Brief at 22, n.5. Insofar as McCullough attempts to raise the second *ex parte* communication at the May 1, 2019 evidentiary hearing, we decline to consider it because it was beyond the scope of our remand order. **See Commonwealth v. Sepulveda**, 144 A.3d 1270, 1280 n.19 (Pa. 2016) (noting that "where a case is remanded for a specific and limited purpose, issued not encompassed within the remand order may not be decided on remand, as a remand does not permit a litigant a proverbial second bite at the apple.") (citation omitted); **see also** Pa.R.A.P. 2591.

a mutual friend, Paul Needle ("Mr. Needle") whom he described as a psychologist. *Id.* at 37, 43. Judge Nauhaus denied that he discussed with Mr. Needle his preference for McCullough to go non-jury. *Id.* at 38. On the contrary, Judge Nauhaus testified that he prefers "jury trials over non-jury trials." *Id.* at 38. Nonetheless, Judge Nauhaus testified that he shared with Mr. Needle his general observation that McCullough's case lacked jury appeal because McCullough "was charged with scamming a demented, old woman who had no heirs, but a load of money." *Id.* at 47-48. Judge Nauhaus further testified that he "talked to [Mr. Needle] about trial strategy" on a lot of cases, including McCullough's. *Id.* at 46. Finally, McCullough's counsel questioned Judge Nauhaus about the allegation that, during the pendency of McCullough's trial, Judge Nauhaus discussed with his secretary that McCullough was guilty of five counts of theft. *Id.* at 39-41. Judge Nauhaus denied the allegation, explaining that "[a]t the time of the trial, whether you know it or not, I was a Senior Judge. And as a Senior, I didn't have an assigned secretary. I shared a secretary with I believe two other judges. That woman's name was Peggy Moore [("Ms. Moore")]." *Id.* at 40.

On cross-examination, Judge Nauhaus denied that he was friends with Attorney Pushinsky or that he socialized with Attorney Pushinsky. *Id.* at 41. Judge Nauhaus also denied that he yelled at Attorney Pushinsky during the first telephone conversation relating to the *habeas* petition. *Id.* Judge Nauhaus explained that he did not think his telephone call to Attorney Pushinsky was improper because he was not discussing the issues involved.

*Id.* at 42. "I was telling him when the hearing was going to be and I just wanted this case to go forward. It was foot dragged." *Id.*

Elaborating on his interaction with Mr. Needle, Judge Nauhaus remarked:

> I was not trying to back channel. I didn't even know that he knew [Attorney] Pushinsky. I was basically talking about the fact that I knew about the case had no jury appeal at all. And we were just talking about the whole case and the fact that there should be consideration for a non-jury trial with a case like that. This was [(sic)] case involved with scamming a demented woman.

*Id.* at 43. Judge Nauhaus further stated that Attorney Pushinsky never responded to him in any way about the communication with Mr. Needle and that Mr. Needle never gave him any feedback about Mr. Needle's conversation with Attorney Pushinsky. *Id.* at 43-44. Judge Nauhaus repeated that he preferred jury trials because they were easier. *Id.* at 44. He once again denied that he ever discussed McCullough's case with his secretary, Ms. Moore, and that he fairly and impartially presided over McCullough's trial. *Id.* at 45. Judge Nauhaus acknowledged that he did not let any anger toward Attorney Pushinsky or McCullough affect the outcome of McCullough's trial. *Id.* Finally, in answering the question whether he felt any reason to recuse himself from the guilt phase of McCullough's trial, Judge Nauhaus stated:

> At the time the motion was filed, the answer to that was no. Eventually, I did recuse. It had to do with the fact I didn't think I could fairly sentence after all of these motions and all of these things occurred. I didn't think I could fairly sentence him. I asked Judge Manning to assign it to someone else. So I did recuse myself, but not for the reasons that were listed in the original [recusal] petition.

- 29 -

*Id.* On re-direct, Judge Nauhaus explained that he sent a letter to Judge Manning "asking to give it to someone else." *Id.* at 48. Judge Nauhaus denied any involvement in sentencing McCullough. *Id.* at 48-49.

Judge Cashman noted that he entered Judge Nauhaus' recusal on the record at the sentencing hearing, explaining:

> Judge Nauhaus told me that he had come from his position that his blood pressure was off the chart and he couldn't handle it any further. And that's why he gave it to Judge Manning, who was the President Judge who supervises the work of the Senior Judges. And Judge Manning as the President Judge gave it to me because at the time I was the Administrative Judge in the Criminal Division.

*Id.* at 50-51. McCullough's counsel acknowledged that there were no "threats at the [status] conference" for McCullough to go non-jury. *Id.* at 55.

McCullough next called to the stand Attorney Pushinsky. *Id.* at 56. At the start of Attorney Pushinsky's testimony, McCullough waived his attorney/client privilege in connection with any *ex parte* communications his former counsel, Attorney Pushinsky, had with Judge Nauhaus as set forth in the recusal petition. *Id.* at 57. Attorney Pushinsky testified that he was McCullough's trial counsel in the instant matter. *Id.* at 58. He testified that he filed a *habeas* petition on December 29, 2014 and that, shortly thereafter, he received a telephone call from Judge Nauhaus regarding the *habeas* filing. *Id.* at 58-59. Attorney Pushinsky testified that Judge Nauhaus called his office and talked to him after his secretary transferred Judge Nauhaus' call to him. *Id.* at 59. Attorney Pushinsky described Judge Nauhaus as "pretty upset" or "upset, angry, bothered." *Id.* Attorney Pushinsky recalled that Judge

Nauhaus' voice was raised and that he "started yelling at me about the motion I had just filed." *Id.* at 59-60. Describing the nature of Judge Nauhaus' comments, Attorney Pushinsky recalled Judge Nauhaus stating that "[t]he motion was improper. It was too long, you attached too many things to it. *Habeas corpus* motions should properly be decided solely on the transcript. And therefore, the arguments that I included in the motion and documentary exhibits that were attached to the motion were improper." *Id.* at 60. Attorney Pushinsky testified that he found Judge Nauhaus' response to be improper. *Id.* Attorney Pushinsky also testified that he told Judge Nauhaus that he

> was going to do [his] job as a lawyer and file the motions I thought were appropriate. And that his job was rule on the motions. And if he didn't like the motions or thought the motion was incorrect, he could rule against [him] and if I wanted to and thought it appropriate, I take him up on appeal. His job was to decide motions and my job was to file them.

*Id.* at 61. Attorney Pushinsky estimated that the telephone call with Judge Nauhaus lasted five to ten minutes. *Id.* Attorney Pushinsky acknowledged that prior to Judge Nauhaus' call, he had never received a telephone call from a judge regarding the filing of a *habeas* motion. *Id.* at 61-62. Attorney Pushinsky confirmed that the Commonwealth and McCullough were not on the telephone call with Judge Nauhaus. *Id.* at 62. Attorney Pushinsky added that he would have declined to receive Judge Nauhaus' call had he known the reason for the call. *Id.*

> I didn't know why I got the phone call. If I had known in advance what the phone call was going to be about, I wouldn't have taken the phone call. When my secretary said that Judge Nauhaus was on the line, I had no idea what the call was about. He may have wanted to say come in tomorrow for a status conference. I didn't

know what the conversation would be when I took [the] phone call.

*Id.* Attorney Pushinsky testified that he considered Judge Nauhaus' call to be improper and *ex parte* communication. *Id.*

Attorney Pushinsky next testified about the second *ex parte* communication he had with Judge Nauhaus. *Id.* at 63. Attorney Pushinsky testified that, at some point prior to trial, he called Judge Nauhaus' chambers to schedule a status conference. *Id.* Someone on Judge Nauhaus' staff answered the call and placed him on hold. *Id.* at 63-64. Thereafter, according to Attorney Pushinsky, Judge Nauhaus got on the line. *Id.* at 64.

> The Judge wanted to know what I was calling about. I said that I wanted to have a status conference and there were certain issues related to the case that I thought should be discussed prior to normal court proceedings. Issues on how to either address, and I don't mean answer necessarily, but how would we go to present the issues.
>
> . . . .
>
> The Judge asked what the issues were what I wanted to discuss on the status conference.

*Id.* at 64-65. Attorney Pushinsky relayed that he neither anticipated speaking directly with Judge Nauhaus nor wanted to discuss any substantive issues with him. *Id.* at 63. As a result, when asked by Judge Nauhaus about what issues he wanted to discuss, Attorney Pushinsky recalled telling Judge Nauhaus something to the effect: "[y]ou don't really want me to tell you now, do you?

*Id.* at 65. Judge Nauhaus, however, responded in the affirmative. *Id.*

> I told him what the first issue was. He said, next. I told him what the next issue, and he said no. I don't remember how many issues. But I was told that there would be no status conference on those issues that I thought we should discuss at a status conference.

- 32 -

*Id.* Attorney Pushinsky testified that he did not discuss with Judge Nauhaus whether McCullough would testify at trial. *Id.* at 66. He further testified that, although Judge Nauhaus denied him the opportunity to have a status conference, Judge Nauhaus did not deny any relief on the merits. *Id.* ("There was no suggestion of what the rulings would be on the substantive issues."). Attorney Pushinsky relayed that the Commonwealth was not a part of this second exchange with Judge Nauhaus. *Id.* at 64. Attorney Pushinsky testified that he "worked very closely" with McCullough and that he discussed with McCullough his call to Judge Nauhaus' chambers. *Id.* at 68.

Attorney Pushinsky also testified about his communication with Mr. Needle, a mutual friend of his and Judge Nauhaus', relating to non-jury trials. *Id.* Attorney Pushinsky recalled that, prior to trial, Mr. Needle conveyed to him that Judge Nauhaus "thought we should consider going non-jury. I can't say that there was a preference for, that the Judge relayed a preference. That was what the friend said to me." *Id.* at 68. In clarifying, Attorney Pushinsky stated that "I guess Judge Nauhaus was talking to [Mr. Needle] about the trial that he was doing. And *[Mr. Needle] said*, Pushinsky should think about going non-jury." *Id.* at 70 (emphasis added). Attorney Pushinsky testified that he and McCullough had "extensive discussions about the jury/non-jury selection." *Id.* at 72. Attorney Pushinsky further testified that McCullough did not pursue a recusal motion until after verdict. *Id.* at 72.

On cross-examination, Attorney Pushinsky acknowledged that he did not socialize with Judge Nauhaus. *Id.* at 73. Attorney Pushinsky recalled that

when he entered his appearance, this case was before the Honorable Donald Machen. *Id.* When McCullough inquired about Judge Machen's reputation and judicial temperament, Attorney Pushinsky relayed:

> I would have told him that Judge Machen was known to be mercurial and that he can appear on the bench one day as your best friend, and the next moment fly off the handle. Go in different directions, so you didn't know who you were going to see when you went before Judge Machen. And I believe I had a good relationship with Judge Machen.

*Id.* at 74-75. Attorney Pushinsky recalled that he also had a conversation with McCullough about Judge Nauhaus' judicial temperament when this case was assigned to him. *Id.* at 75.

> With all the years that I've had, I've never had a case before Judge Nauhaus. So I could only relate what I have heard from other people. And he could be extremely acerbic, arrogant. And that I speak to a number of lawyers who I could talk to who may have had more experience with Judge Nauhaus to find out what it was like to practice before Judge Nauhaus.

*Id.* at 75-76. Attorney Pushinsky reaffirmed that Judge Nauhaus called him after he had filed the *habeas* petition to yell at him. *Id.* at 79 ("It wasn't the first time a judge has yelled at me and it probably wouldn't be the last."). Attorney Pushinsky acknowledged that although he entered his appearance in October 2011, he did not file the *habeas* petition until December 29, 2014. *Id.* at 81. Explaining the timing of the *habeas* filing, Attorney Pushinsky testified:

> The file at that point was extensive. It would have taken me a long time to go through with it. We had a change in Judge's [sic]. That would have entailed change in strategy. Perhaps we didn't think the motion was appropriate while it was before Judge Machen. If you tell me when Judge Nauhaus was assigned the case, it probably wouldn't have been all that long after Judge Nauhaus got the case. And we started developing the case for it to be tried before Judge Nauhaus.

*Id.* at 81-82. For purposes of providing background, Attorney Pushinsky testified:

> I knew that the Judge was going to be leaving for a lengthy vacation. [McCullough] and I believed that it was important to get the motion in his hands before he left town. We actually, as I recall, considered that he might get angry if we filed after he left town. So as I recall, timed the filing so that he could have it, he could take it with him and rule on it at his leisure. He's going to be away and there was nothing that was going to happen at the trial. We weren't looking for a ruling in the next 48 or 72 hours. Nothing was going to occur until he came back to Pittsburgh[.]

*Id.* at 83-84. Attorney Pushinsky described his reaction after receiving Judge Nauhaus' call. *Id.* at 82. "I got angry and I yelled back at the Judge, so physically upset[.] But I said to him, my job is to file motions and you rule on them. You do what you want and I will take whatever appropriate action we have for it." *Id.* Attorney Pushinsky denied being intimidated by Judge Nauhaus or being visibly shaken. *Id.* at 82-83. Attorney Pushinsky remarked that he informed McCullough about Judge Nauhaus' phone and discussed it with McCullough in his office. *Id.* at 83. Attorney Pushinsky, however, denied informing the Commonwealth:

> Because I thought the Judge was blowing off steam. He was angry that he got dropped this 100-page document on the eve of him going away, and he got angry. Just like I said to [McCullough], I would get angry and yell. I thought the Judge got angry. Yes, it was improper. Would I have taken the call if I knew what the call was about? The answer would be no. I didn't think it really addressed merit issues in terms of the merits of the case. And so I didn't want to make a mountain of what at that point I perceived as a mole hill, even if it was improper.

*Id.* at 84-85. Attorney Pushinsky also denied that Judge Nauhaus' call influenced his opinion about whether McCullough should proceed jury or non-jury. *Id.* at 85. He testified that he did not believe Judge Nauhaus' call was

a sufficient basis to seek his recusal. *Id.* Attorney Pushinsky acknowledged that, during a hearing on February 2, 2015, he specifically rejected Judge Nauhaus' invitation to have McCullough seek his recusal in this case. *Id.* at 89.

Attorney Pushinsky remarked that he informed McCullough of his conversation with Mr. Needle. *Id.* at 90. He, however, denied following up with Judge Nauhaus on his conversation with Mr. Needle. *Id.* Attorney Pushinsky conceded that he viewed his conversation with Mr. Needle as *ex parte*, "but no different than any time the Judge's [(sic)] in the Criminal Division or even Civil Division suggest to counsel they ought to consider going to a non-jury." *Id.* Attorney Pushinsky, however, denied the allegation that he told McCullough that Judge Nauhaus would sandbag him. *Id.* at 91. He explained that he did not think a judge is going to "screw over, sandbag a party that decides not to go in that direction. There was nothing said by Judge Nauhaus that indicated to me that as much as I disagree with his verdict, he wouldn't do anything other than decide the case as he thought it should be decided." *Id.* Attorney Pushinsky testified that he did not view his conversation with Mr. Needle as an implicit threat from Judge Nauhaus. *Id.* at 92. Finally, Attorney Pushinsky acknowledged that it was McCullough's decision to go non-jury. *Id.* at 93 ("I looked over at [McCullough] and he nodded his head at me. So I said, Your Honor we'll go non-jury."); *see id.* at 102 (noting McCullough decided to go non-jury).

Following Attorney Pushinsky's testimony, the Commonwealth informed the trial court that it was withdrawing its offer to *nolle pros* the 2016 charges. ***Id.*** at 104-05.  McCullough objected.  In so doing, he noted that he agreed with the offer and that the Commonwealth withdrew it only because he objected to the Commonwealth's examination of Attorney Pushinsky based on attorney/client privilege. ***Id.*** at 105, 115.  The parties eventually stipulated that McCullough "was in agreement with the offer." ***Id.*** at 118.

McCullough next called Mr. Schmotzer to the stand, who testified that he was a friend of McCullough, noting that this case has strained their friendship. ***Id.*** at 107-08.  Mr. Schmotzer indicated that he repeatedly urged McCullough to opt for a jury trial. ***Id.*** at 108-09.  Initially, Mr. Schmotzer declined to answer questions about what he shared with McCullough six to seven weeks prior to the verdict being rendered in this case. ***Id.*** at 108-09. He then testified that he "spoke with one or two persons" about Judge Nauhaus' uncertainty relating to the charges pending against McCullough. ***Id.*** at 112.  While declining to name the individuals involved, Mr. Schmotzer testified:

> I will not give you their names.  I will tell you this.  It's the secretary from what I can recall.  It was the secretary that motivated the Judge to say something like, you have to find him guilty because I think the charges were dismissed on all the small counts.  I think it was the secretary who was doing the motivation of telling the Judge that he has to be found guilty of something because of the optics of the case.  I believe [McCullough] is an honest man and a good man.  But that's not what the optics of this case is.

*Id.* Mr. Schmotzer, however, repeatedly refused to reveal the identity of the source for this information, claiming that he gave the person his "word" and would not break confidences. *Id.* at 113. In turn, Judge Cashman found Mr. Schmotzer in civil contempt pending his identification of the source. *Id.*

Thereafter, McCullough asked the trial court's permission to offer the testimony of Attorney Pollock, who represents him in connection with the 2016 charges. *Id.* at 115. Among other things, McCullough sought to establish that Attorney Pollock observed Judge Nauhaus in Judge Cashman's chambers "immediately prior to sentencing." *Id.* Judge Cashman remarked: "I will stipulate to that. He was in my chambers. And he was telling me his position for recusal." *Id.* at 116. Judge Cashman further stated that Judge Nauhaus did not discuss McCullough's case, but rather that "his blood pressure was out of whack." *Id.* Finally, Judge Cashman denied any involvement by Judge Nauhaus in fashioning McCullough's sentence. *Id.*

Judge Cashman asked Mr. Schmotzer to be brought back to cure the contempt. *Id.* at 119. After Judge Cashman indicated that he would conduct a contempt hearing the following day, Mr. Schmotzer agreed to answer the question. *Id.* at 122-23. Mr. Schmotzer explained:

> The Judge and the secretary were in their chambers. And they were having a discussion, just talking. And the secretary volunteered what she thought of the case. Judge Nauhaus has not made a decision yet. From what I recollect, she said that you have to convict him of something.
>
>   . . . .
>
> I think he was leaning towards an acquittal.

*Id.* at 123. According to Mr. Schmotzer, this conversation was relayed to him by a court employee. *Id.* He identified the empoyee as Janine Palmer who also goes by Janine McVay ("Ms. McVay"). *Id.* at 125.

On cross-examination, Mr. Schmotzer acknowledged that he did not know whether Ms. McVay worked in the court system when he spoke to her about McCullough's case. *Id.* at 125. When the Commonwealth confronted Mr. Schmotzer about testimony at the November 19, 2015 hearing where he stated that he told McCullough to go non-jury, Mr. Schmotzer remarked that the transcript was "100 percent wrong." *Id.* at 126-27.

Attorney Megan Will testified next. She testified that Mr. Schmotzer's recollection of what he said at the November 19, 2015 hearing was inconsistent. She testified that "[a]t the hearing, he testified that he ***did tell*** [McCullough] to go non-jury. He confirmed that with me on the phone the night before that hearing." *Id.* at 129 (emphasis added). The trial court kept open the record for additional testimony.

On May 8, 2019, Judge Cashman resumed the evidentiary hearing, at which McCullough offered the testimony of Mr. Needle, Ms. McVay and Ms. Moore, Judge Nauhaus' secretary. N.T. Hearing, 5/8/19, at 3.

Mr. Needle, a self-employed psychologist, testified that he had known Judge Nauhaus for twenty-two years. *Id.* at 4-5. He recalled that he came to be friends with Judge Nauhaus because they worked out at the same gym at the same time. *Id.* at 5. He testified that he has known Attorney Pushinsky for "[a]pproximately the same amount of time." *Id.* Mr. Needle considered

Attorney Pushinsky to be a friend. *Id.* Mr. Needle confirmed that he was a mutual friend of Judge Nauhaus and Attorney Pushinsky. *Id.* at 6. Mr. Needle testified that, prior to McCullough's trial, he had a discussion with Judge Nauhaus about a case. *Id.* at 6, 9. "I didn't know at the time the man's name or what the case was about." *Id.* at 6. Mr. Needle recalled that Judge Nauhaus discussed with him his thoughts about the case. *Id.* Specifically, Mr. Needle testified that "[Judge Nauhaus] said that he had read the case very carefully and there was a lot of material. And it was his opinion that perhaps a jury might not always understand the complexities of the case. So he thought perhaps a non-jury trial would be appropriate." *Id.* Mr. Needle, however, could not recall Judge Nauhaus' exact words. *Id.* According to Mr. Needle, at the time he discussed McCullough's case with Judge Nauhaus, Judge Nauhaus was aware that Mr. Needle was friends with Attorney Pushinsky. *Id.* at 7. Mr. Needle recalled that the conversation about McCullough's case "was fairly short," "no more than five minutes. *Id.* at 7-9. This discussion occurred in Judge Nauhaus' living room with no one else present. *Id.* at 8. Mr. Needle denied having any other conversations with Judge Nauhaus regarding McCullough's case. *Id.*

Mr. Needle testified that he had a conversation with Attorney Pushinsky at a mutual friend's dinner party, where he informed Attorney Pushinsky "what I was told by Judge Nauhaus that he thought the case was highly complicated, and perhaps a non-jury trial would be appropriate." *Id.* at 9-10. Mr. Needle recalled Attorney Pushinsky's response. "He said, thank you very much, but

I will give this information to my client. However, this decision is up to him and not to me." *Id.* at 10. According to Mr. Needle, his conversation with Attorney Pushinsky lasted only a "few minutes." *Id.* at 10. Mr. Needle also testified that he did not have any follow-up discussions with Judge Nauhaus regarding McCullough's case after he spoke to Attorney Pushinsky. *Id.* at 11. He also denied having any additional discussions with Attorney Pushinsky. *Id.*

On cross-examination, Mr. Needle denied that Judge Nauhaus instructed him to tell Attorney Pushinsky that McCullough should opt for a non-jury trial. *Id.* at 12.

McCullough next presented the testimony of Ms. McVay for purposes of corroborating Mr. Schmotzer's testimony. *Id.* at 14. Ms. McVay testified that she knew Mr. Schmotzer because she worked for him in 2012. *Id.* at 15. She testified that she was "good friends" with Mr. Schmotzer. *Id.* at 16. Ms. McVay relayed that she also was friends with McCullough whom she first met "through Allegheny County politics." *Id.* She testified that she would occasionally go out with Mr. Schmotzer and McCullough to talk about politics. *Id.* at 17. Although she acknowledged that they discussed his charges, Ms. McVay denied that they ever discussed McCullough's trial. *Id.* According to Ms. McVay, she was employed as a minute clerk by Allegheny County courthouse when McCullough's trial commenced in April 2015. *Id.* She described that a minute clerk was tasked with assisting "the Judge in the courtroom and do court orders." *Id.* at 17-18. Ms. McVay, however, was a floater, not assigned to any particular courtroom. *Id.* at 18. She further

- 41 -

relayed that, as of the time of the hearing, she held the same position in the courthouse. *Id.* When asked whether she could recall a conversation with Ms. Moore, where Ms. Moore told her that she convinced Judge Nauhaus to convict McCullough of the theft charges, Ms. McVay denied any knowledge of any such conversation. *Id.* at 18-19. In fact, she denied ever having this type of conversation with anyone. *Id.* at 18. Ms. McVay also denied that she ever had this type of discussion with Mr. Schmotzer. *Id.* at 19. Specifically, she denied that she ever had a conversation with Mr. Schmotzer "about the verdict" in McCullough's case. *Id.* Ms. McVay also denied that she told Mr. Schmotzer not to reveal that she had a conversation with him. *Id.* at 21. Similarly, according to Ms. McVay, Mr. Schmotzer never told her that he was not going to reveal that she was the individual with whom he had the discussions. *Id.*

On cross-examination, Ms. McVay reaffirmed that Ms. Moore "never told [her] that Judge Nauhaus felt that the Commonwealth had not proved its case." *Id.* at 20. Likewise, she also reaffirmed that she "never told Mr. Schmotzer that [Ms.] Moore told [her] that Judge Nauhaus felt that the Commonwealth had not proven its case." *Id.*

McCullough called his last witness Ms. Moore, who testified that she works as a secretary to Judge Manning at the Allegheny County Courthouse. *Id.* at 22. She testified that during McCullough's trial, she was loaned out to Judge Nauhaus. *Id.* She denied that she knew McCullough personally. *Id.* However, she conceded that she knew "him from court." *Id.* Ms. Moore

- 42 -

testified that she knew Attorney Pushinsky, but denied any recollection of Judge Nauhaus calling him following his filing of the *habeas* petition. *Id.* at 22-24. She also denied any recollection of Attorney Pushinsky calling Judge Nauhaus' chambers in connection with a status conference. *Id.* at 24. Ms. Moore further denied the allegation that she had conversations with Judge Nauhaus regarding the verdict in McCullough's case during the pendency of the case. *Id.* Specifically, she denied that she discussed with Judge Nauhaus that the Commonwealth had not proven its case beyond a reasonable doubt. *Id.* Ms. Moore recalled that she "may have talked about it with pleadings and stuff, because I had to put all that stuff in order." *Id.* at 24-25. She also denied discussing the verdict in McCullough's case with Ms. McVay or in the presence of Ms. McVay. *Id.* at 25. Ms. Moore testified that she did not know Ms. McVay as she was new to the courthouse at the time. *Id.* On cross-examination, Ms. Moore rejected the allegation that she "ever t[old] Ms. McVay that Judge Nauhaus had told [her] that the Commonwealth had not proven its case against [McCullough], and that he felt compelled to issue a verdict[.]" *Id.* at 26.

Given Ms. McVay's and Ms. Moore's testimony, McCullough's counsel abandoned Mr. Schmotzer's allegation as a basis for seeking Judge Nauhaus' recusal. *Id.* at 42 ("I can't argue the merits of the petition on that point in light of the testimony. I will not do that."). Following the hearing, Judge Cashman denied McCullough's recusal petition for want of merit. *See* Trial Court Order, 5/8/19. McCullough filed a supplemental appeal. The trial court

directed McCullough to file a supplemental Rule 1925(b) statement. McCullough complied, raising ten assertions of error containing multiple sub-issues and spanning seven pages. In response, the trial court issued a detailed supplemental Rule 1925(a) opinion, concluding that McCullough's recusal petition lacked merit.

On appeal before us,[10] in addition to the two remaining issues regarding sufficiency, *see supra*, at 20, McCullough now presents the following four supplemental issues which we have renumbered for ease of disposition:

> [III.] Whether the trial court erred in failing to grant McCullough a new trial when Judge Nauhaus' conduct established his lack of impartiality and appearance of bias and impropriety?
>
> [IV.] Whether Judge Nauhaus' actions in discussing matters pertaining to the resolution of McCullough's case violated his constitutional right to be present at all relevant proceedings?
>
> [V.] Whether the trial court erred in quashing the subpoena to the [JCB] where McCullough requested only witness statements that went directly to the resolution of his recusal petition?
>
> [VI.] Whether the trial court erred in failing to find prosecutorial misconduct in the Commonwealth's unilateral decision to rescind

---

[10] On July 10, 2019, we granted the JCB's application to intervene in this appeal to address McCullough's fifth ("V") supplemental issue. Upon invitation by this Court, the JCB filed an intervenor's brief on November 19, 2019. The JCB asserts that the trial court did not err in granting its motion to quash McCullough's subpoena because Article V, Section 18 of the Pennsylvania constitution mandates that the confidentiality of the complaints to, and the investigations by, the JCB be protected. *See* Intervenor's Brief at 12. The JCB aptly notes that McCullough "does not cite any binding cases where a court ordered the production of materials that were constitutionally protected in a criminal trial, let alone a recusal hearing." *Id.* at 20. The JCB points out that, although he raised it below, McCullough has abandoned his argument that "his Confrontation Clause rights under the Sixth Amendment or Article I, Section 9 have been violated" by failing to assert it before us. *Id.* at 21, n.9.

the agreement it had with McCullough to *nol[le] pros* charges pending against him in exchange for his testimony at the recusal hearing?

McCullough's Supplemental Brief at 1 (unnecessary capitalizations omitted).[11]

We address Appellant's claims *seriatim*. As mentioned, in addition to the foregoing,[12] McCullough argues his convictions for theft by unlawful taking and misapplication of entrusted funds were not supported by sufficient evidence.

With respect to his convictions for theft by unlawful taking, McCullough claims the Commonwealth failed to prove beyond a reasonable doubt that he knowingly and unlawfully took Jordan's property because (1) he was a co-trustee of Jordan's estate; (2) served as her attorney; and (3) possessed, in his opinion, a valid power of attorney authorizing him to ask other co-trustees to issue checks from her estate. McCullough's Brief at 31-42.

"A claim challenging the sufficiency of the evidence is a question of law." ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000).

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In

---

[11] We note that McCullough filed his supplemental reply brief on December 2, 2019.

[12] McCullough seeks recusal based upon only the two telephone conversations between Judge Nauhaus and Attorney Pushinsky and Mr. Needle's conversations with Judge Nauhaus and Attorney Pushinsky. As mentioned earlier, however, we decline to consider the second alleged *ex parte* conversation between Judge Nauhaus and Attorney Pushinsky. **See**, **supra**, at note 10.

addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

Section 3921(a) of the Crimes Code provides that "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S.A. § 3921(a).

Here, upon review of the evidence viewed in a light most favorable to the Commonwealth as the verdict winner, we agree with the trial court's conclusion that the Commonwealth proved beyond a reasonable doubt that McCullough committed theft by unlawful taking. *See* Trial Court Opinion, 5/1/17 at 32-40. The trial court found that McCullough drafted the springing power of attorney in question, which called for Jordan to be declared incompetent only upon a physician's written determination. The trial court further found that the power of attorney was not valid because a physician never determined—nor put a determination in writing—that Jordan was incompetent. Thus, in the absence of a written determination of incapacity by a physician, the power of attorney was not valid. Without a valid power of

attorney, McCullough could never have been a co-trustee of Jordan's estate or obtained her property to use as his own. In specific, the trial court found that "[i]f McCullough had no power of attorney then he was incapable of exercising control over Jordan's property, could not have been appointed a co-trustee of her estate and could only act as an attorney for Jordan." *Id.* at 32. As a result, McCullough's actions with respect to Jordan's property were unlawful.

Moreover, neither PNC nor Northwest Bank conducted an independent investigation as to the validity of the power of attorney. The trial court found that PNC was presented with a copy of the power of attorney which had a medallion attached to it which only indicated what was being given to PNC was a true and correct copy of the power of attorney that was given to McCullough. Because McCullough had appointed himself co-trustee and was acting not only in a capacity as Jordan's lawyer, but also as Jordan herself, PNC presumed that the power of attorney was valid. Similarly, when McCullough dissolved the trust and directed PNC to file a first and final account, he presented the power of attorney to Northwest Bank. In so doing, he represented to Northwest Bank that the power of attorney was valid given his ability to terminate the PNC trust. In light of McCullough's representations, the banks did not make an independent determination about whether the springing feature in the power of attorney had occurred to render the power of attorney valid.

Relatedly, when McCullough joined Eckert Seamans and brought Jordan over as a client, the lawyers that were working with him on Jordan's affairs also treated the power of attorney as being valid and made no independent investigation as to whether or not the springing feature of that power of attorney had occurred. "The fact that two banking institutions and several lawyers did not do their independent investigation does not validate the power of attorney, nor does it establish that McCullough was unaware of the invalidity of the power of attorney that he created." *Id.* at 36.

The trial court further determined that McCullough had conflicts of interest in administrating Jordan's trust. The trial court credited the testimony of Frances Johnston of PNC who testified that she became uncomfortable with the manner in which McCullough was handling Jordan's affairs. Ms. Johnston described the responsibilities of a trustee as, *inter alia*, administering "the trust for the benefit of that individual, not the benefit of the trustee." *Id.* at 34. "There is a duty to control and protect the trust property. There's a duty to keep the trust property separate from the property of the fiduciaries. And there is a duty to avoid conflicts of interest." *Id.* Ms Johnston specifically testified that she observed "numerous conflicts with respect to the manner in which McCullough was handling Jordan's affairs." *Id.* The trial court summarized Ms. Johnston's concern:

> McCullough wanted his sister to be appointed as a caregiver to Jordan at a rate higher than the normal rate. She also expressed a concern that the ten-thousand-dollar check given to Catholic Charities was not in Jordan's interest. In addition, she was concerned that the purchases of a five-hundred-thousand-dollar certificate of deposit from another bank would dilute the control

of [PNC] over Jordan's assets. She was particularly concerned about the fact that McCullough wanted the ninety-year-old woman to purchase commercial real estate from another of McCullough's clients and she viewed this an absolute conflict of interest. Finally, of no small concern was the manner McCullough was micro-managing Jordan's affairs by expressing a desire to have his son cut Jordan's grass.

*Id.* at 35.

McCullough's argument that he did not have absolute authority of Jordan's property and that Northwest Bank controlled the issuance of checks is belied by the record. The trial court found that "[w]hen McCullough created a new trust, Northwest Bank was one of the trustees and instead of having two trustees, it had three. John Zadar from Northwest Bank, Jordan and [McCullough]." *Id.* at 36. The trial court explained that the "net effect of having these three trustees is that McCullough stacked the deck because regardless of what Northwest Bank would care to do with Jordan's funds, it would always be outvoted since [McCullough] was a trustee and he [also] would be acting pursuant to his power of attorney so that any vote would always be two to one." *Id.* As a result, McCullough had an absolute authority to do whatever he desired to do with Jordan's property or funds and, contrary to McCullough's assertions, Northwest Bank lacked any power to restrain him.

To the extent McCullough argues that the Orphans' Court Division of the Court of Common Pleas of Allegheny County accepted as valid the power of attorney and that, as a result, the trial court was bound by the law of the case and coordinate jurisdiction doctrines to defer to the Orphans' Court's ruling, such argument is devoid of merit. As the trial court found, "the Orphans'

Court never ruled on the validity of the power of attorney but, rather, examined the first and final account as prepared by [PNC] during its tenure as a trustee of Jordan's property." *Id.* at 37.

Finally, McCullough argues that he did not intend to deprive Jordan of the benefit of her property because the gifts to Catholic Charities and the political candidates were aligned with Jordan's donative dispositions and that he did not personally benefit from these donations. We disagree. The testimony of Jordan's prior lawyer revealed that she never made donations to religious organizations and any donations to charities were concerned with animals and helping the blind. Jordan never expressed an interest in donating to religious charities. *Id.* at 40. Additionally, the trial court found that, by putting his name on the donation checks, McCullough derived a personal benefit to the detriment, and at the expense, of Jordan. The trial court found that McCullough "specifically directed his secretary to type on the checks that these checks were generated by him from Jordan's estate. The only purpose for the inclusion of his name is to ensure that he received a benefit for those contributions." *Id.*

Thus, based upon the foregoing and viewed in a light most favorable to the Commonwealth, we agree with the trial court that the Commonwealth proved beyond a reasonable doubt that McCullough committed theft by unlawful taking. As the trial court concluded:

> When looking at McCullough's power of attorney, it is clear that there is no evidence in the record which would establish that the springing event necessary to validate the power of attorney was ever presented. If McCullough had no such power of attorney,

- 50 -

then any actions that he took with respect to Jordan's property were unlawful and demonstrated his intention to take Jordan's property and deprive her of it. If the power of attorney was valid then in looking at the entire record, it is clear that the actions undertaken by McCullough were not designed to benefit Jordan, but were rather in violation of his fiduciary duties and these actions were designed for the sole purpose of benefitting McCullough both personally and politically.

*Id.* at 35. Accordingly, McCullough's sufficiency claim regarding theft by unlawful taking fails.

We next address McCullough's sufficiency claim regarding his convictions for misapplication of entrusted property. In this regard, McCullough argues that "the Commonwealth failed to prove beyond a reasonable doubt that he requested donations be made from the estate of [Jordan] for whom he was a fiduciary knowing that the donations were unlawful and involved a substantial risk of loss and detriment to the owner." *Id.* at 43-51.

Section 4113(a) of the Crimes Code provides that a person commits misapplication of entrusted property "if he applies or disposes of property that has been entrusted to him as a fiduciary, or property of the government or of a financial institution, in a manner which he knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted." 18 Pa.C.S.A. § 4113(a).

Here, upon our review of the record, viewed in a light most favorable to the Commonwealth as the verdict winner, we agree with the trial court's conclusion that the Commonwealth proved beyond a reasonable doubt that McCullough committed misapplication of entrusted funds. *See* Trial Court

Opinion, 5/1/17 at 40-49. McCullough argues that there is no proof that he knew that the contributions made from Jordan's estate were either unlawful or presented a risk of loss to her estate. In support, he points out that Jordan's estate increased in value by almost two million dollars during the period of time that he handled the estate and, consequently, she did not suffer any losses. We disagree. As the trial court explained, "[t]he value of Jordan's estate did not increase because of McCullough's stewardship but, rather because of the bull market that affected the more than ninety companies in which Jordan held an interest." *Id.* at 41. When McCullough authorized the issuance of five checks for $10,000 each, Jordan's estate was deprived of $50,000. That money, however, was returned when the individual recipients of the checks understood that Jordan did not authorize the issuance of the checks. Moreover, the issuance of the checks, as the trial court found, "no way demonstrates Jordan's donative disposition since she had no history of political contributions nor did she have a history of donating to religious charities." *Id.* As stated, one of Jordan's prior lawyers credibly testified that "she did not like religious charities and would never donate to them." *Id.* The trial court further observed:

> In a blatant exercise of sophistry, McCullough maintains that no theft or misappropriation of entrusted property had occurred since all of the money that he gave away was returned by the recipients. The theft and misappropriation occurred when he gave Jordan's money to others. The fact that the money was returned is of no moment.

*Id.* When a defendant "disposes of property that has been entrusted to him as a fiduciary . . . in a manner which he knows is unlawful and involves substantial risk of loss or detriment to the owner of the property" under Section 4113 (a), his intent to "replace" that property in the future is irrelevant. The only pertinent inquiry is whether he disposes of entrusted property in a manner that he knows is unlawful and involves a substantial risk of loss or detriment to the owner of the property. Instantly, McCullough knowingly disposed of Jordan's funds when he issued five checks totaling $50,000 and in so doing, he caused an actual, not a merely a risk of, loss to Jordan. The crime was completed at that time, regardless of the later return of the funds. *See generally Commonwealth v. Grife*, 664 A.2d 116, 119-20 (Pa. Super. 1995), *appeal denied*, 676 A.2d 1196 (Pa. 1996) (holding that, in the context of a prosecution involving theft by deception, when the defendant obtains money through intentional falsehoods, "intent to repay does not necessarily negate the crime of false pretenses" and thus the fact that the defendant "might have had plans to pay the creditors back is of no moment.").

We also reject McCullough's related argument that he did not gain a personal benefit from the donations. Specifically, McCullough claims that $50,000 donations solely benefitted Jordan. As a result, McCullough suggests that he did not dispose of Jordan's property in a manner which he knew was unlawful. We disagree. The trial court found that McCullough personally benefitted from the contributions he made from Jordan's estate, without

authorization, to Catholic Charities and the four Republican candidates totaling $50,000. The trial court specifically found that Jordan had no interest in donating to religious charities or supporting Republican candidates.

According to the trial court, McCullough donated $10,000 from Jordan's estate to Catholic Charities after his wife, Patricia McCullough, informed him that the organization was falling short of its fundraising goal. Patricia McCullough then served as the Executive Director of Catholic Charities. The trial court found that, once McCullough delivered the check to his wife, she "advised the people intimately connected with the fundraising activities not to disclose the names of the donor or the fact that this anonymous donor was a client of her husband." *Id.* at 42. The trial court also found that "[i]t was obvious that the check was delivered to Catholic Charities to help Patricia McCullough in her role as the executive director and show that she was an effective fundraiser." *Id.*

With respect to donating to the four political candidates, the trial court found that McCullough benefitted personally.

> McCullough went to the Lincoln Day Dinner and began passing out the checks to Vincent Gastgeb, Susan Caldwell and Jan Rea, knowing that Kevin Aklin had already been endorsed by Jan Rae, Vincent Gastgeb and Jim Roddey. In addition to providing Gastgeb with a ten-thousand-dollar check, he also made him his finance director for his campaign. As a result of these activities, especially the issuance of the checks, Gastgeb withdrew his endorsement of Acklin and endorsed McCullough, as did Jan Rea. This contention of the lack of receipt of benefits for these contributions is contradicted by McCullough's own words. When it became apparent that McCullough was going to run for the county at large seat, Michael Devanney, who was helping Acklin, called McCullough to set up a meeting to discuss McCullough's intentions. At that meeting McCullough told Devanney that he had a wealthy client who was going to be supportive of his campaign

and was supportive of his interests. If one were to accept McCullough's contention that Jordan suffered from dementia at all times material to this case, then she could never have made a rational decision to support McCullough's candidacy and be financially supportive of that candidacy or, more importantly, how could she have signed the power of attorney prepared by McCullough.

*Id.* at 43. McCullough regarded Jordan's "money as his own and was using her as a private bank to finance his political ambitions." *Id.* at 44. McCullough's contention that he derived no benefit from the donations is contradicted by the record. The trial court explained:

There is no rational explanation why McCullough had to have the checks almost immediately and that they be personally delivered by him. There is no rational explanation as to why he had to have his secretary type his name of these checks. There is no rational explanation as to why he had to personally deliver the checks to Rea, Gastgeb and Caldwell at the Lincoln Dinner which was shortly before the [R]epublican party endorsement, especially in light of the fact that none of these candidates were opposed in the primary election, although one might suggest he was personally delivering the checks to save Jordan the postage charges. The only rational explanation for all of the actions was to benefit McCullough's political aspirations which was done when these candidates withdrew their endorsement of Acklin and endorsed McCullough.

*Id.* at 44. Thus, based upon the evidence presented at trial, as detailed above and viewed in a light most favorable to the Commonwealth, we hold that the Commonwealth proved beyond a reasonable doubt that McCullough committed misapplication of entrusted funds. McCullough's use of the funds did not benefit Jordan for whose benefit the trust was established when McCullough donated from the trust to Catholic Charities and contributed to political campaigns. As a result, he is not entitled to relief.

We now turn to McCullough's issues three, four, and five, as they all relate to his claim that Judge Nauhaus should have recused himself. Upon

thorough review, we conclude that McCullough has abandoned his right to seek Judge Nauhaus' recusal. As set forth above, he failed to seek Judge Nauhaus' recusal "at the earliest possible moment."[13] *See Lomas v. Kravitz*, 130 A.3d 107, 390 (Pa. Super. 2015) (*en banc*) ("If the party fails to present a motion to recuse at that time, then the party's recusal issue is time-barred and waived."), *aff'd*, 170 A.3d 380 (Pa. 2017). The facts adduced at the evidentiary hearing following remand have clarified that McCullough indeed was aware of the alleged *ex parte* conversations between Judge Nauhaus and Attorney Pushinsky and Mr. Needle and Judge Nauhaus and Attorney Pushinsky prior to trial. As the record, which is detailed above, reveals, "[a]ll of these [*ex parte*] conversations occurred prior to McCullough's decision as to how to try his case and he was informed by [Attorney] Pushinsky almost immediately after each conversation occurred and what was said during these conversations. . . . McCullough was fully advised as to all of these conversations and made a knowing, intelligent and voluntary decision to proceed with a non-jury trial." Trial Court's Supplemental Opinion, 8/20/19

_____

[13] As Judge Cashman astutely observed, we did not decide the issue of waiver when we remanded McCullough's case for a new evidentiary hearing on the recusal petition for purposes of fleshing out facts. *See* Trial Court's Supplemental Opinion, 8/20/19 at 49-52 ("Since there was no ruling on the question of waiver, [McCullough] is not subject to the law of the case because there was no disposition on this particular claim. . . . McCullough waived his right to file a petition for recusal since he did not do it at the first instance as required by law."). Although the dissent had asserted waiver, the majority declined to do so at that juncture because the evidentiary record was not properly developed.

at 20-21. McCullough was colloquied in open court and waived his right to a jury trial both orally and in writing. N.T. Trial, 4/9-4/14/15 at 40-43. In other words, despite his knowledge of the *ex parte* communications, McCullough decided to waive his right to a jury trial. McCullough sought recusal only after receiving an unfavorable verdict. As the trial court found, "McCullough knew at all times of the facts which could give rise to the filing of a motion for recusal and rather than protect his rights by filing the appropriate motion for recusal, [he] decided to hold in reserve these alleged claims of judicial misconduct as a hedge against him being found responsible for his criminal activities." Trial Court's Supplemental Opinion, 8/20/19 at 52. Accordingly, McCullough waived his recusal claim.

As for McCullough's contention that Judge Nauhaus' actions in discussing matters pertaining to the resolution of his case violated his constitutional right to be present at all relevant proceedings, such contention is waived. McCullough did not raise this argument in his initial appeal and only does so now following remand. As a result, this issue falls outside the scope of the remand. *See supra* note 10.

McCullough's claim that the trial court erred in quashing the subpoena to the JCB likewise would be without merit.[14] As the trial court explained, the

---

[14] As noted earlier, McCullough's claim regarding the quashal of his JCB subpoena is related to his effort to seek Judge Nauhaus' recusal. It was in this context that McCullough issued a subpoena to the JCB on remand. Because we have determined that McCullough does not obtain relief on the

Pennsylvania constitution prohibits the JCB from disclosing whether or not any type of judicial inquiry has ever taken place. *Id.* at 13. Additionally, McCullough also would not obtain relief on his related confrontation clause argument. The trial court explained:

> The confrontation clause applies to a criminal proceeding where evidence is sought to be presented against a defendant who has been denied the ability to challenge that evidence.[15] The information sought by McCullough from the [JCB] did not involve a criminal proceeding against McCullough but, rather, involved a potential inquiry concerning the handling of McCullough's criminal case; the focus, however, being Judge Nauhaus. The purpose of the [JCB] is civil in nature although it may lead to criminal indictment; however, it is not a criminal proceeding. As previously noted, the focus of the inquiry if, in fact it took place, was not McCullough but, rather, Judge Nauhaus.

*Id.* at 14. Accordingly, McCullough is not entitled to relief.

Lastly, with respect to McCullough's claim of prosecutorial misconduct relating to the *nolle pros* offer, we agree with the Commonwealth's assertion that McCullough has abandoned this issue on appeal. Commonwealth's

_____

underlying recusal issue, we need not address and resolve this issue involving the JCB. To the extent we do, we conclude that the issue is bereft of merit.

[15] The Sixth Amendment's Confrontation Clause provides that, "[i]n all **criminal** prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *See* U.S. CONST. amend. VI (emphasis added). The United States Supreme Court has held that "this bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (citation omitted). Article I Section 9 of the Pennsylvania Constitution provides: "In all **criminal** prosecutions the accused hath a right . . . to be confronted with the witnesses against him." Pa. Const. art. I, § 9 (emphasis added). In light of the federal and state constitutions, it is clear that the confrontation clause applies only to criminal proceedings. *See Detterline v. D'Ambrosio's Dodge, Inc.*, 763 A.2d 935, 939 (Pa. Super. 2000) ("There is no support in the plain meaning of the Confrontation Clause for a *civil* right to confront witnesses.") (emphasis in original).

Supplemental Brief at 47. As set forth in detail above, McCullough's counsel agreed with the trial court's conclusion that the *nolle pros* offer was premature. *See* N.T. Hearing, 5/1/19 at 27. Even if this issue were not abandoned, McCullough still would not be eligible for relief based on the reasons outlined in the trial court's supplemental opinion. *See* Trial Court's Supplemental Opinion, 8/20/19 at 36-47. Generally, "[p]rosecutorial misconduct occurs where the 'unavoidable effect' of the prosecutor's actions is to 'prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict.'" *Commonwealth v. Chmiel*, 777 A.2d 459, 464 (Pa. Super. 2001). Here, the trial court explained:

> There is nothing in the Commonwealth's actions which would constitute prosecutorial misconduct since th[e trial court] did not reject the Commonwealth's offer to *nolle pros* the case but only made the determination that at the time that the request was made, it was premature since there was another action currently pending which had to be resolved. Since there was no decision on the Commonwealth's request for a *nolle pros*, it had the opportunity to reassess its position and did so, at which time it made the decision not to *nolle pros* McCullough's other case. That decision did not constitute prosecutorial misconduct but rather was a decision of case management.

*Id.* at 46. McCullough's claim therefore fails.

In sum, based on the foregoing, we conclude that McCullough's sufficiency claims lack merit and his recusal claims are waived because he failed to file the underlying recusal motion at the earliest possible moment. McCullough's prosecutorial misconduct claim similarly is waived and otherwise

without merit. Accordingly, we affirm the trial court's December 17, 2015 judgment of sentence.

Judgement of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/25/2020